IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ELECTION SYSTEMS & SOFTWARE, LLC,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>RBM CONSULTING, LLC and GERALD G. HAYEK, an Individual,<br><br>　　　　　　　Defendants. | 8:11-CV-438<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motion for summary judgment filed by defendants RBM Consulting, LLC and Gerald G. Hayek. Filing 112. For the reasons discussed below, defendants' motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiff Election Systems & Software, LLC ("ES&S") manufactures and sells voting machines and the software used to program and run the machines. Filing 24 at ¶ 1. And it provides support and maintenance services for its machines. RBM is also in the elections business. Filing 24 at ¶ 2. It does not manufacture voting equipment. Rather, RBM provides service and maintenance to government clients who use various makes and models of voting machines, including machines manufactured by ES&S. Filing 113-2 at ¶¶ 3–5. Hayek was employed by ES&S until June 2010; thereafter he went to work for RBM. Filing 113-2 at ¶¶ 2, 11.

### A. ES&S' Unity Software and Proprietary Firmware

ES&S developed and owns Unity Election Management System Software ("Unity Software"). Unity Software helps state and local governments manage elections. The software allows governments to create databases of election information, format ballots, program election equipment, and collect and report voting results. Filing 24 at ¶ 6.

Among the equipment manufactured by ES&S is the Model 650 Central Ballot Counter (the "M650"), which is a "high-speed central paper ballot counter and vote tabulator." Filing 24 at ¶ 10. The counting and tabulation

processes of the M650 are controlled by Unity Software and ES&S' firmware. Firmware is "permanent software programmed into a [device's] read-only memory." *The New Oxford American Dictionary* (Oxford University Press 2005). So, ES&S' firmware is the programming code loaded onto a voting machine that allows the machine to operate. Filing 137-2 at ¶ 6.

In contrast, Unity Software is a user application that is loaded onto and operated from a computer; it is not loaded onto or used on the voting machines itself. Filing 113-2 at ¶¶ 14, 16. Instead, the Unity Software is used to "code" the particular election's data into a program or routine for the voting machine to run. This coding or "output" is saved onto a disc or flash drive which is then loaded onto the voting machine. *See*, filing 113-2 at ¶¶ 14–16, 41–42; filing 113-3 at ¶¶ 16–18; filing 113-5 at 6–7, 12; filing 113-6 at 6–8. So, to operate the M650 to conduct an election count, one must use the firmware on the M650 to operate the machine itself, and the Unity Software on a separate computer to program the M650 for the particular election. Without both the firmware and the software, the M650 will not work.

### B. ES&S' Protection of Its Intellectual Property

ES&S has taken steps to ensure that the intellectual property in its firmware and the Unity Software remain secret. Steve Bolton, Vice President of Intellectual Property Management for ES&S, averred that ES&S strictly controls access to the source code for its firmware and the Unity Software.[1] Filing 137-2 at ¶¶ 1–4, 6. Only select ES&S programs and service technicians have access to the source code. Filing 137-2 at ¶ 6. Additionally, the source code is encrypted, and only certain ES&S employees have the encryption keys. Filing 137-2 at ¶ 7.

ES&S does not sell customers its firmware or software. Rather, it licenses them to customers through restrictive agreements. These licenses prohibit ES&S' customers from using either the firmware or software on any

---

[1] "When programmers write code, they write in 'source code,' which is written in a programming language that humans can understand." *Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 755 n.5 (9th Cir. 2008) (citations omitted). Source code is then compiled into machine-readable "object" or "executable" code that actually directs a computer's operation. *Id.*; *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 773 n.2 (S.D. Tex. 2010). While the source code is intelligible to humans, the object code consists merely of sequences of binary or hexadecimal digits and is (generally speaking) not intelligible to humans. *See Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000). "Generally, when software is distributed, only the compiled object code is distributed and the programmer retains the source code." *Gagnon*, 542 F.3d at 755 n.5. This helps to ensure that the underlying design elements and secret aspects of the software remain secret.

machines not purchased by the customer from ES&S and do not allow the customer to provide the firmware or software to any third party. Although ES&S' customers have use of the software and firmware, they too lack access to the source code. Filing 137-2 at ¶¶ 6–7.

### C. The June 2011 Centre County Recount

This lawsuit was apparently prompted by an article and photograph that appeared on June 2, 2011, in the Centre Daily Times, a newspaper based in Centre County, Pennsylvania ("Centre"). The article described a recount election that Centre conducted on June 1. The article described Hayek feeding ballots into a ballot reader, and included a photograph of Hayek. Filing 113-12 at 1–2. ES&S claims that it learned of this article in September 2011, and that the photograph showed, and the article described, Centre using an M650 to conduct the recount. *See* filing 136 at 3. (However, the article does not mention the brand of the voting machine, and the voting machine is barely visible in the photograph.) In any event, ES&S somehow came to suspect that in conducting the recount, RBM and Hayek had improperly used the Unity Software and ES&S' proprietary firmware. And that, RBM claims, is what prompted the current lawsuit.

The parties have since provided a more detailed account of how the recount was conducted. In the days leading up to June 2011, Centre election officials asked RBM to assist them in conducting a recount election. Normally, Centre utilized ES&S' M100 model voting machines. But state law required that the recount be accomplished using a different voting machine, and so Centre asked RBM to locate a different ES&S model, the M650, to use in the recount. RBM obtained the M650 by borrowing one from Mahoning County, Ohio ("Mahoning"). Filing 113-3 at ¶¶ 2, 32–37; filing 113-2 at 36–43.

Hayek was present at the recount and assisted Centre officials. Filing 113-2 at ¶ 39. The parties deposed two Centre election officials who managed the June 2011 recount: Joyce McKinley, the Director of Voter Registration and Elections, and Jodi Neidig, the Assistant Director and Supervisor of Voter Registration and Elections. Hayek, McKinley, and Neidig described how the recount was conducted.

Neidig used Centre's copy of the Unity Software to program the M650 for the recount. The software was located on a desktop computer belonging to Centre. Neidig operated the computer by herself, and used the software to code the recount data onto a card, which she then gave to Hayek, who inserted it into the M650. Filing 113-2 at ¶ 40–41; filing 113-5 at 6–7; filing 113-6 at 4–6. Hayek operated the M650 by himself, which included operating the machine's control panel, feeding ballots into its scanner, and physically transferring the zip disk containing the results from the M650 to the Centre

officials, who then uploaded the information onto their computer. Filing 113-2 at ¶ 42; filing 113-5 at 6–8; filing 113-6 at 4–5. When the recount was completed, Hayek returned the M650 to Ohio. Filing 113-2 at ¶ 43.

The undisputed evidence shows that in conducting the Centre recount, defendants did not supply or operate the Unity Software. Moreover, Hayek and Todd Mullen, a manager and member of RBM, averred that Hayek and RBM have never possessed or copied the Unity Software, have never solicited customers or prospective customers by using copies of the software, and have never supplied the software to a customer. Filing 113-2 at ¶ 17–20; Filing 113-3 at 19–22. Mullen explained that RBM does not supply software to its customers, and that its customers must procure any necessary software from the voting machine manufacturer. Filing 113-3 at ¶¶ 22–23. In sum, ES&S has produced no evidence that defendants are using Unity Software in their business.

However, questions of fact remain regarding the *firmware* used to conduct the June 2011 recount. Mullen also averred that RBM does not supply firmware to its customers. Filing 113-3 at ¶¶ 22–23. But ES&S has produced evidence from which a jury could reasonably infer otherwise, at least as to the June 2011 recount.

Neither McKinley or Neidig were asked who provided the firmware for the M650. *See* filings 113-5 and 113-6. But Bolton and Tobey Dingbaum, ES&S' Federal Certification Manager, both averred that Centre, RBM, and Hayek have never purchased an M650 or a license for the M650 firmware. Filing 137-2 at ¶ 9; filing 137-3 at ¶ 9. McKinley verified that Centre had never purchased an M650. Filing 113-5 at 5.

In other words, ES&S did not supply the firmware, and there is no reason Centre would have had the firmware for a machine it did not normally use. The firmware must have come from somewhere, and defendants have not explained where. Based on this evidence, a jury could reasonably infer that Mahoning's firmware arrived together with its M650, and that it was this firmware that was used to conduct the June 2011 recount. And ES&S' licenses would not have permitted Mahoning to lend the firmware to Centre. Filing 137-2 at ¶¶ 6–7.

But even if that were true, ES&S' claims based on the firmware used at the recount cannot withstand summary judgment. As the Court explains below, ES&S has failed to show that RBM violated any of its legally protected interests. And with two minor exceptions, the same is true for ES&S' claims against Hayek.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. ANALYSIS

In its operative complaint, ES&S brings five claims against defendants: (1) copyright infringement; (2) misappropriation of trade secrets, in violation of the common law and the Nebraska Trade Secrets Act, Neb. Rev. Stat. §§ 87-502 *et seq.*; (3) conversion; (4) breach of contract (against Hayek only); and (5) deceptive trade practices in violation of the laws of Nebraska and Pennsylvania. Filing 24 at ¶¶ 24–50. The Court finds that, with two narrow exceptions, ES&S has failed to produce evidence that creates a genuine issue of material fact on any of its claims. All of ES&S' claims against RBM will be dismissed. The two that remain are ES&S' claim for breach of contract and conversion, against Hayek alone, and only as related to an ES&S toolkit that Hayek allegedly failed to return.

Before proceeding to the merits, some procedural matters bear noting. Although this case is before the Court on a motion for summary judgment, a number of discovery motions remain pending. *See*, filings 65, 68, 73, 76, 79,

83, 87, 116, 119. On October 6, 2014, the Magistrate Judge held a telephonic hearing on these motions. At that hearing, the Magistrate began to question whether, when ES&S filed this lawsuit, it actually had any evidence to support its claims. And the Magistrate Judge wondered aloud whether sanctions, under Fed. R. Civ. P. 11, might be warranted. *See* filing 94 at 1:40:00. Citing this concern, as well as the complexity of the pending discovery motions, the Magistrate determined that it made sense for the parties to first proceed to summary judgment, and to then handle any discovery motions that remained viable.

The Court finds that this was a reasonable approach. And the parties have not objected to this arrangement in their motions for summary judgment, although ES&S has requested an opportunity to proceed with some additional discovery under Rule 56(d). The Court, having carefully reviewed the record, finds that even now, over 3 years after this lawsuit was filed, ES&S lacks evidentiary support for the great majority of its claims. The Court further finds that ES&S has failed to demonstrate that it is entitled to additional discovery under Rule 56(d).

That said, the parties' various discovery motions remain pending before the Magistrate Judge. It may be that, through those motions, ES&S is still entitled to certain discovery on its surviving claims for breach of contract and conversion against Hayek, or as relates to RBM's counterclaims. The Court is not expressing any opinion, one way or another, on the merits of the pending motions for discovery. But the Court will make the following observation. The contours of this case—or at least ES&S' claims—have now changed significantly. And the parties may find that it will be easier to proceed to an efficient and fair resolution of their remaining discovery disputes by updating and consolidating the pending discovery motions.

## A. Copyright Infringement

ES&S first claims that defendants have infringed the copyright in its Unity Software by, among other things, conducting the Centre recount. Defendants counter that: (1) ES&S has failed to produce any evidence that it registered any copyright in Unity; and (2) even if ES&S had registered a copyright, it has failed to prove any infringing conduct by defendants. The Court finds in favor of the defendants on both points.

### 1. Registration

A copyright in a work "subsists from its creation." 17 U.S.C. § 302(a). However—subject to certain exceptions which are not applicable—the Copyright Act requires copyright holders to register their works with the Copyright Office before suing for infringement. 17 U.S.C. §§ 411(a) & 501(b);

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157–58, 165 (2010). In *Muchnick*, the Supreme Court clarified that the registration requirement is not jurisdictional. 559 U.S. at 166. However, it does impose a "precondition to suit." *Id.* That continues to hold true, even after *Muchnick*. *See, e.g.*, *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011); *Airframe Sys., Inc. v. L-3 Commc'ns Corp.*, 658 F.3d 100, 105 (1st Cir. 2011); *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615 (9th Cir. 2010); *see also Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1012–1014 (8th Cir. 2006).

ES&S has not produced a certificate of registration—the typical way that registration is demonstrated. Instead, to prove that the Unity copyright was, in fact, registered, ES&S has submitted only a brief declaration from Bolton, who averred that "ES&S' Unity software was copyrighted by ES&S." Filing 137-2 at ¶ 5. Bolton further explained that "[a]t the time of registration, it was known as 'election administration and control model system design' and the applicable copyright numbers are V3407D789 (registered in 1997), V3514D750 (registered in 2004), and V3522D317 (registered in 2005)." Filing 137-2 at ¶ 5.

There are a number of problems with this declaration. First, Bolton was conspicuously unable to commit to stating that ES&S had *registered* the copyright. ES&S may indeed have "copyrighted" the software; but copyrighting a work is not the same as registering that copyright. *See* 17 U.S.C. § 302(a). More troubling are the copyright numbers cited by Bolton. Defendants have retrieved the documents corresponding to these numbers from the United States Copyright Office, using its online search feature.[2] Filing 139-1 at ¶¶ 4–7; filings 139-5, 139-6, and 139-7. These records show that the "copyright numbers" referenced by Bolton do not, in fact, refer to any copyright registration. Rather, these document numbers are associated with "recorded documents," that is, certificates of recordation memorializing an assignment of ES&S' rights in its copyrighted works. Even unregistered works may be assigned, and those assignments recorded, and so a certificate of recordation does not show that the work itself has been registered. *See* 17 U.S.C. § 205(a) and (c). A certificate of recordation is not evidence of recordation, as it "merely indicates that the document attached was recorded in the Copyright Office on a specific date." *Latin American Music Co. Inc. v. Media Power Group, Inc.*, 705 F.3d 34, 43 (1st Cir. 2013).

ES&S has thus failed to produce any evidence that it ever registered its copyright in Unity Software. Indeed, the Court is somewhat perplexed as to

---

[2] U.S. Copyright Office, *Search Copyright Records*, http://www.copyright.gov/records/ (last accessed January 27, 2015).

how, if ES&S had actually registered a copyright, it could not, after 3 years into this lawsuit, have obtained a certificate of registration. Lacking any proof of registration, ES&S' copyright claim must be dismissed.

2. Infringing Conduct

In addition to proving ownership and validity of the copyright (and registration), a claim of copyright infringement requires the plaintiff to show some infringing conduct, that is, a violation of the copyright owner's exclusive rights by, for example, unauthorized reproduction and distribution of the copyrighted work. *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992). ES&S' attempt to show infringement is not supported by the evidence.

Bolton and Dingbaum both averred that ES&S' licenses do not allow its customers to use ES&S' software or firmware on any machines not purchased by the customer from ES&S. Filing 137-2 at ¶ 6; filing 137-3 at ¶ 6. So, ES&S contends, while Centre lawfully possessed a copy of the Unity Software, Centre was not licensed or authorized to use the software to program the M650. Similarly, Mahoning's license would not have permitted it to lend the firmware to Centre. Filing 137-2 at ¶¶ 6–7.

However, the defendants in this case are RBM and Hayek, not Centre or Mahoning. And the undisputed evidence shows that in conducting the recount, Hayek never used the Unity Software. The software was used solely by Centre officials, who programmed the recount data onto a card, which Hayek then inserted into the M650. Filing 113-2 at ¶ 40–41; filing 113-5 at 6–7; filing 113-6 at 4–6. That output data is not the same as the Unity Software. As defendants explained, and ES&S has failed to contradict, the Unity Software resides solely on the user's computer, and is never loaded onto the voting machine. *See*, filing 113-2 at ¶¶ 14–16, 41–42; filing 113-3 at ¶¶ 16–18; filing 113-5 at 6–7, 12; filing 113-6 at 6–8. And ES&S has not produced any evidence that it held a copyright to the output generated by the Software. In short, ES&S has produced no evidence that defendants copied the Unity Software or otherwise infringed upon ES&S' copyright. And while Hayek would have necessarily utilized ES&S' *firmware* when he operated the M650, ES&S has not claimed any copyright in its firmware.

In response, ES&S asserts that further discovery is needed under Fed. R. Civ. P. 56(d). That rule provides that, if the nonmoving party shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the Court may: (1) defer considering or deny the motion for summary judgment; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d). A Rule 56(d) affidavit should describe (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably

- 8 -

expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful. *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008).

Prior to defendants' motion for summary judgment, ES&S moved to compel an inspection of all ES&S voting machines in defendants' possession. *See* filing 65. That motion remains pending. Now, in its Rule 56(d) request, ES&S asserts that such an inspection would allow it to determine what, if any, copies of Unity Software might be in RBM's possession. *See* filing 136 at ¶¶ 8, 16. But as defendants have demonstrated, the Unity Software does not reside on the voting machines. *See* filing 113-2 at ¶¶ 14–16. So, this type of inspection would not allow ES&S to raise a genuine issue of material fact on its copyright claim, and the Court will deny ES&S' Rule 56(d) request.

Finally, ES&S points to the fact that RBM assists its customers in operating Unity. *See* filing 77-4 at 7–8. But ES&S has not explained how this assistance amounts to a violation of its copyright, let alone cited any law in support of this argument. A claim for copyright infringement does not depend on whether a county hires its own employees or retains independent contractors to help it run an election. In short, ES&S has failed to produce any evidence of infringement by defendants. And even if it had, ES&S has not shown that it registered its copyright, and its claim for infringement fails as a matter of law.

## B. Misappropriation of Trade Secrets

ES&S' next claim is for misappropriation of trade secrets, under both Nebraska's Trade Secrets Act, Neb. Rev. Stat. §§87-501 *et seq.*, and the common law.[3] To prevail on this claim, ES&S would need to prove, among other things, the existence of a trade secret and defendants' misappropriation of it. *See*, Neb. Rev. Stat. §§ 87-502–504; *Richdale Development Co. v. McNeil Co., Inc.*, 508 N.W.2d 853, 859 (Neb. 1993).

ES&S' operative complaint focuses almost exclusively on defendants' alleged misconduct as relates to the Unity Software. *See* filing 24. However, ES&S has now retreated from its claim that defendants misappropriated any trade secrets in that software. *See* filing 136 at 13–14. In any event, ES&S has produced no evidence that defendants ever used the software, let alone misappropriated any of its trade secrets. Instead, ES&S is now arguing that defendants misappropriated the trade secrets underlying its firmware. ES&S claims that defendants did this in two ways: (1) simply by using the M650 to

---

[3] ES&S has not identified how its common law claim would differ in any way from its statutory claim. The Court therefore considers the same analysis to dispose of ES&S' common law claim.

conduct the 2011 recount; and (2) because Hayek allegedly failed to return a specialized toolkit that contained ES&S' firmware.

Defendants have objected to this rather abrupt change in course, some 3 years into this litigation. They argue that there is nothing in ES&S' operative pleading that would have notified them of such claims, and ask the Court to refuse to allow ES&S to assert the claim now, "on the eve of summary judgment." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004).

Defendants' argument is not misplaced. While "the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Id*. And ES&S' operative pleading makes only a single, passing mention of firmware, instead focusing overwhelmingly on the Unity Software. *See* filing 24 at ¶ 11. Nor was the matter raised in the parties' Rule 26(f) report. *See* filing 30. And although it was ES&S' attorneys who primarily deposed Neidig and McKinley, they never inquired about the firmware used to operate the M650. *See* filings 113-5 and 113-6.

However, it is not necessary, at this time, to attempt to define the outer limits of the claims embraced by ES&S' pleadings. The Court will assume that, for the time being, ES&S' operative complaint provided adequate notice of its firmware theory. And the Court will further assume, for the sake of this motion, that the source code behind the firmware constituted a trade secret.[4] Neb. Rev. Stat. § 87-502(4). Nonetheless, ES&S' second claim fails, because it has not produced any evidence that defendants misappropriated any trade secrets underlying its firmware, either by using the M650 or due to Hayek's alleged failure to return the toolkit.

### 1. Use of the M650

ES&S contends that defendants misappropriated the trade secrets in its firmware simply by using the firmware to operate the M650 voting machine. This argument cannot be squared with a common sense reading of Nebraska's Trade Secrets Act. The Court finds persuasive the reasoning of the California Court of Appeal, interpreting California's (for present purposes) identical Trade Secrets Act. *Silvaco Data Sys. v. Intel Corp.*, 184

---

[4] ES&S has presented evidence that it took steps to maintain the secrecy of the source code underlying its firmware. While ES&S' customers had access to the firmware, they did not have access to the underlying source code. Filing 137-2 at ¶¶ 6–8.

Cal. App. 4th 210 (2010);[5] *compare*, Neb. Rev. Stat. § 87-502(2) and (4), *with* Cal. Civ. Code § 3426.1(b) and (d).

"One does not, by executing machine-readable software, 'use' the underlying source code; nor does one acquire the requisite knowledge of any trade secrets embodied in that code." *Silvaco*, 184 Cal. App. 4th at 216. These conclusions rest upon the definition of two key concepts, common to the Uniform Trade Secrets Act adopted in both Nebraska and California: "trade secret" and "misappropriation."

First, a "trade secret" is defined as:

> *information*, including, but not limited to, a drawing, formula, pattern, compilation, *program*, device, method, technique, code, or process that:
>
> (a)   Derives independent economic value, actual or potential, *from not being known to*, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Neb. Rev. Stat. § 87-502(4) (emphasis supplied).

In this case, then, the trade secret is not the firmware's object or "executable" code, which ES&S distributes to its customers, but its source code. *See Silvaco*, 184 Cal. App. 4th at 220–22. As ES&S' own evidence shows, defendants would not have had access to the source code. *See* filing 137-2 at ¶ 6. Instead, defendants would only have possessed and used the object code. As the *Silvaco* court explained:

> One who possesses the source code for a program may readily ascertain its underlying design, and may directly incorporate it, or pieces of it, into another program. In order to yield a functioning computer application, however, source code must generally be translated or "compiled" into machine-readable (executable) code. After a program is compiled, it may still be

---

[5] *As modified on denial of reh'g*, 2010 Cal. App. Lexis 771 (May 27, 2010) *and review denied*, (Aug. 18, 2010), *and overruled on other grounds by Kwikset Corp. v. Superior Court,* 246 P.3d 877 (Cal. 2011). The modification on the court's denial of rehearing was minor and did not affect its substantive analysis. *See* 2010 Cal. App. Lexis 771.

represented as text, but the text is not readily intelligible to human beings, consisting of strings of binary (base 2) or hexadecimal (base 16) numbers. For this reason, the source code for many if not most commercial software products is a secret, and may remain so despite widespread distribution of the executable program.

*Silvaco*, 184 Cal. App. 4th at 218 (footnote omitted). In other words, the object code executed by defendants was not itself a trade secret, nor could it have disclosed the source code or imparted any knowledge of its secret aspects.

Second, there was no misappropriation. Under Nebraska's Trade Secrets Act, "misappropriation of a trade secret may be achieved through three types" of acts: acquisition, disclosure, or use. *Id.* at 222. "Misappropriation" is defined as:

(a)  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)  Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i)  Used improper means to acquire knowledge of the trade secret;

(ii)  At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(A)  Derived from or through a person who had utilized improper means to acquire it;

(B)  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C)  Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

> > (iii)   Before a material change of his or her position, knew or had reason to know that the information was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Neb. Rev. Stat. § 87-502(2) (emphasis supplied).

ES&S does not claim, and has presented no evidence, that defendants ever disclosed the source code to any other person. Nor has ES&S shown that defendants acquired the source code. That would require the use of encryption keys that ES&S has not shown them to possess. *See*, filing 137-2 at ¶ 8; *Silvaco*, 184 Cal. App. 4th at 222–23. And merely executing the object code for the firmware does not constitute a "use" of the underlying source code, for purposes of the Trade Secrets Act:

> One clearly engages in the "use" of a secret, in the ordinary sense, when one directly exploits it for his own advantage, e.g., by incorporating it into his own manufacturing technique or product. But "use" in the ordinary sense is not present when the conduct consists entirely of possessing, and taking advantage of, *something that was made* using the secret. One who bakes a pie from a recipe certainly engages in the "use" of the latter; but one who eats the pie does not, by virtue of that act alone, make "use" of the recipe in any ordinary sense, and this is true even if the baker is accused of stealing the recipe from a competitor, and the diner knows of that accusation. Yet this is substantially the same situation as when one runs software that was compiled from allegedly stolen source code. The source code is the recipe from which the pie (executable program) is baked (compiled). Nor is the analogy weakened by the fact that a diner is not ordinarily said to make "use" of something he eats. His metabolism may be said to do so, or the analogy may be adjusted to replace the pie with an instrument, such as a stopwatch. A coach who employs the latter to time a race certainly makes "use" of it, but only a sophist could bring himself to say that coach "uses" trade secrets involved in the manufacture of the watch.

*Id.* at 224.

Moreover, even if defendants' use of the firmware "could otherwise be held to constitute a misappropriation of the source code used to compile it, that conduct would only sustain liability if accompanied by the mental state prescribed by the statute." *Id.* And "[o]f the five varieties of actionable 'use'

- 13 -

listed in the statute, four unmistakably require the defendant to have 'knowledge of the trade secret.'" *Id.*; *see* Neb. Rev. Stat. § 87-502(b)(i) & (ii)(A)–(C). The use of the passive voice in the fifth variety, § 87-502(b)(iii), suggests that it is theoretically possible "that a defendant might be liable, though himself lacking knowledge of a trade secret, if he 'used' it with knowledge that *another*, on whom his use somehow depended, had acquired knowledge of it as a result of accident [or] mistake." *Silvaco*, 184 Cal. App. 4th at 225. But ES&S has not presented evidence of such a scenario occurring in this case. Therefore, defendants would have needed to first acquire knowledge of the trade secret before they could be said to have used it.

"To 'know' a thing is to have information of that thing at one's command, in one's possession, subject to study, disclosure, and exploitation. To say that one 'knows' a fact is also to say that one *possesses information* of that fact." *Id.* at 226. And as the Court has already explained, defendants did not possess the source code. Just as in the previous pie analogy, "[t]he customer does not, by buying or eating the pie, gain knowledge of the recipe used to make it." *Id.*

In sum, once the precise information constituting the claimed trade secret is identified, the undisputed evidence shows that defendants did not gain the required knowledge of that information, let alone use or otherwise misappropriate it. ES&S' claim for misappropriation therefore fails as a matter of law.

## 2. The Toolkit

ES&S claims that when Hayek left its employ, he failed to return a specialized toolkit customized for work on ES&S' voting machines, and that this toolkit included ES&S' firmware. Filing 137-4 at ¶ 4. In support of this assertion, ES&S offers the declaration of Al Moraczewski, an ES&S director of "Field Services." Filing 137-4 at ¶ 1. Moraczewski stated that as part of his job, he supervised the service and maintenance of ES&S voting machines, and that Hayek was under his supervision. Filing 137-4 at ¶¶ 4–5. Moraczewski avers that while working at ES&S, Hayek was provided with such a toolkit, and that Hayek failed to return the toolkit when he stopped working for ES&S. Filing 137-4 at ¶¶ 6–7. Instead, Moraczewski claims, when Hayek stopped working for ES&S, Hayek

> stated that he intended to spend more time with family yet also indicated that he would be interested in do[i]ng contract work for ES&S and therefore kept his tool kit. However, Hayek would not return phone calls from ES&S after he left, and ES&S learned

that Hayek began working for RBM shortly after terminating his employment with ES&S.

Filing 137-4 at ¶ 8.

Defendants object to Moraczewski's declaration on several grounds. *See* filing 141 at 18–19. They argue that the key paragraphs of his declaration lack foundation, contain hearsay, and are not competent evidence. The Court will overrule defendants' objections at this juncture of the proceedings.

As a general principle, an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). And when such an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56 advisory committee's note (2010 amendments)).

ES&S has not responded to defendants' objections. But the Court finds that Moraczewski's declaration is admissible and competent evidence, or at the very least, that ES&S could readily cure any defects by presenting Moraczewski's testimony at trial. Defendants first object that Moraczewski's testimony is not based on personal knowledge. But Moraczewski begins his declaration by stating that the facts recited therein are based upon his personal knowledge. Filing 137-4 at ¶ 3. And Moraczewski was director of the maintenance division that employed Hayek. Filing 137-4 at ¶¶ 3–5. Defendants also object on hearsay and foundational grounds to paragraph 8, in which Moraczewski describes the phone call supposedly received from Hayek. Defendants note that Moraczewski himself does not state that he took the phone call. But even without that paragraph, Moraczewski's declaration establishes that Hayek received firmware which he did not return.

Defendants have also submitted contradictory evidence. Hayek avers that his direct supervisor was not Moraczewski but Gary Eurek; that a year before Hayek quit, ES&S sent firmware directly to customers and technicians such as himself no longer carried it; and that when he quit working for ES&S, he received a checklist for return of certain materials, and that he returned all items listed on the checklist, such as his cell phone, parts inventory, and diagnostic media. Filing 139-4 at ¶¶ 21–27. Hayek avers that he did not return any firmware to Eurek when he quit because he had not possessed any firmware since ES&S instituted its new policy. Filing 139-4 at

- 15 -

¶ 27. Finally, he states that his supervisor did not express any dissatisfaction with the materials he had returned and that he has never been notified that he failed to return anything. Filing 139-4 at ¶¶ 28–29.

Hayek's declaration, which is much more detailed and specific, could potentially be more credible that Moraczewski's. But on a motion for summary judgment, the Court does not weigh the evidence or determine credibility. *Torgerson*, 643 F.3d at 1042. ES&S has submitted evidence sufficient to create a question of material fact on whether Hayek returned the toolkit, and so that factual dispute must go to the trier of fact. When it comes to ES&S' other claims, for conversion and breach of contract, these disputed facts will also be material—but not so for ES&S' claim of misappropriation of trade secrets. Even if Hayek did retain the toolkit, ES&S has failed to produce any evidence that he ever *did* anything with it. So, ES&S has failed to show that Hayek thereby acquired, used, or disclosed any of the trade secrets underlying the firmware.

### C. Breach of Contract

ES&S next claims that by failing to return the toolkit containing its firmware, Hayek breached a nondisclosure agreement he signed with ES&S. When he began his employment with ES&S, Hayek agreed to the following:

> I agree that I will not at any time, either during or after my employment with ES&S until the Confidential Information becomes publicly known, in any way <u>disclose to anyone or use for any purpose</u> any Confidential Information of ES&S, except as specifically required in the proper performance of the duties of my employment with ES&S or as expressly authorized by ES&S.
> . . . .
> <u>Upon termination of my employment with ES&S for any reason, I agree to immediately return all Confidential Information</u>, including any and all copies thereof, to ES&S.

Filing 24 at ¶¶ 12–15, pp. 14–16 (emphasis supplied).

ES&S has presented evidence that, if credited, would show that Hayek failed to return a toolkit containing its firmware. And even if this firmware only existed in object code, it would still constitute Confidential Information under the nondisclosure agreement. That is because Confidential Information is defined to include, among other things, "information about . . . software (including, without limitation, source and object form)." Filing 24 at ¶ 15, p. 14. So, ES&S' claim for breach of contract, against Hayek only, will proceed.

- 16 -

## D. Conversion

ES&S next claims that defendants converted its firmware by using it to operate the M650 to conduct the Centre recount. With one possible exception, the Court understands ES&S to be asserting a claim for conversion as to the underlying intellectual property, *see* filing 136 at 15–16, and not as to any particular piece of physical media or hardware housing the firmware. As such, ES&S' conversion claim fails for two reasons. First, as to the intellectual property underlying the firmware, any conversion claim is preempted by the Copyright Act. Second, even if ES&S could clear the hurdle of preemption, defendants' use of the firmware simply does not amount to conversion.

### 1. Preemption

The Copyright Act provides the exclusive source of protection for all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by 17 U.S.C. § 106. 17 U.S.C. § 301(a); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). State laws based on rights exclusively protected by the Copyright Act are preempted. *Davidson*, 422 F.3d at 638. A state cause of action is expressly preempted if: (1) the work at issue is within the subject matter of copyright as defined in 17 U.S.C. §§ 102 and 103, and (2) the state-law-created right is equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106. *Davidson*, 422 F.3d at 638.

ES&S' firmware, which is simply a type of software, falls within the subject matter of copyright. *See Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002). So, the question becomes whether a claim for conversion is equivalent to a claim for copyright infringement. A right created under state law is equivalent to those protected by the Copyright Act when it is "infringed by the mere act of reproduction, performance, distribution or display." *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l., Inc.*, 991 F.2d 426, 431 (8th Cir. 1993). However, a state cause of action is not preempted if it passes the "extra element" test. *Id.*; *see also Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 893 (2d Cir. 2011). If the claim requires proof of an element "instead of or in addition to the acts of reproduction, performance, distribution or display," it will not be preempted. *Nat'l Car Rental Sys.*, 991 F.2d at 431. This test is not a technical parsing of the claims' elements. Rather, the question is whether the state law claim requires an extra element that is "*qualitatively* different from a copyright infringement claim." *United States ex rel. Berge v. Board of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997); *see also Richdale Development Co. v. McNeil Co., Inc.*, 508 N.W.2d 853, 858 (Neb. 1993).

ES&S' conversion claim is based solely on the unauthorized use of the intellectual property underlying its firmware. As such, the claim is not qualitatively different from a copyright infringement claim, and is subject to preemption. *See*, *e.g.*, *Two Palms Software, Inc. v. Worldwide Freight Mgmt., LLC*, 780 F. Supp. 2d 916, 921 (E.D. Mo. 2011); *Brignoli v. Balch Hardy and Scheinman, Inc.*, 645 F. Supp. 1201, 1205 (S.D.N.Y. 1986); *State v. Perry*, 697 N.E.2d 624, 630 (Ohio 1998); *see also Richdale Development*, 508 N.W.2d at 858; *cf. Berge*, 104 F.3d at 1464 ("unauthorized use" is not an extra element).

ES&S also asserts that defendants have converted its firmware by using the Unity Software. Filing 136 at 16. But such a claim would also be preempted, and in any event, ES&S has provided no evidence that defendants have used the Unity Software. Similarly, the Copyright Act preempts ES&S' claim that defendants have converted its firmware and software by providing extra ES&S voting machines to RBM's customers. *See*, *e.g.*, filing 113-5 at 16–17 (RBM provided extra M100's to Centre for the 2012 election). And ES&S has failed to produce any evidence that defendants even used the firmware or software when they provided these extra machines. Instead, defendants have produced evidence that when they lend such machines, they expect the client to provide the firmware and software. *See* filing 113-3 at ¶¶ 22–23. And in contrast to the lack of evidence on the firmware used to run the M650, McKinley testified that Centre provided the firmware to operate the extra M100s. Filing 113-5 at 17.

ES&S does not specifically argue that Hayek converted the firmware in the toolkit, and it is unclear whether ES&S is asserting such a claim. Such a claim would be preempted for the same reasons. But ES&S does have a claim for conversion of the actual, physical toolkit itself. Where wrongful deprivation of a particular physical item is alleged, a claim for conversion is not preempted. *See*, *e.g.*, *Berge*, 104 F.3d at 1463; *Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir. 1984); *Frontier Grp., Inc. v. Nw. Drafting & Design, Inc.*, 493 F. Supp. 2d 291, 299 (D. Conn. 2007). If ES&S did intend to bring such a claim, it may proceed.

## 2. There Was No Deprivation of the Intellectual Property

Even if it were not preempted, ES&S' conversion claim—as to its intellectual property—would fail, as ES&S has failed to show that it was deprived of the use or possession of its intellectual property. Under Nebraska law, conversion is "any unauthorized or wrongful act of dominion exerted over another's personal property which deprives the owner of his property permanently or for an indefinite period of time." *Roth v. Farmers Mut. Ins. Co. of Neb.*, 371 N.W.2d 289, 291 (Neb. 1985). "[T]he essence of conversion is not acquisition by the wrongdoer, but the act of depriving the owner

wrongfully of the property." *Zimmerman v. FirsTier Bank, N.A.,* 585 N.W.2d 445, 452 (Neb. 1998).

ES&S has not produced any evidence that it was deprived of the use of its intellectual property. Whatever defendants may have been doing with the firmware or software, their usage did not (and could not) deprive ES&S of possession of the underlying intellectual property. ES&S retained possession of its intellectual property, and was able to use its firmware and software as it saw fit. Because ES&S has not shown that it was deprived of the use of its intellectual property, its conversion claim fails. *See ACI Worldwide Corp. v. MasterCard Techs., LLC,* 2014 WL 7409750, at *8–9 (D. Neb. Dec. 31, 2014); *see also Superior Edge, Inc. v. Monsanto Co.,* 964 F. Supp. 2d 1017, 1039 (D. Minn. 2013). On the other hand, ES&S has produced evidence that it was deprived of the toolkit that Hayek allegedly failed to return. To that extent, ES&S' claim for conversion may proceed.

### E. Deceptive Trade Practices

In its final claim, ES&S alleges violations of Nebraska's Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-301 *et seq.*, and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. §§ 201-1 *et seq.* Both statutes prohibit "deceptive trade practices," which include conduct:

> (ii)   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> (iii)  Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
>        . . . .
>
> (v)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have[.]

73 P.S. § 201-2(4)(ii), (iii), (v); *see also* Neb. Rev. Stat. § 87-302(a)(2), (3), (5) (using essentially the same language). The touchstone of ES&S' claim under these statutes is consumer confusion. *See Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 398 (8th Cir. 1987).

ES&S claims that RBM's "business model is primarily geared towards soliciting ES&S' customers and marketing that RBM personnel is authorized,

trained, or certified to maintain and service ES&S voting machines." Filing 136 at 6. However, ES&S has failed to produce any evidence that defendants are confusing or deceiving consumers. And in the absence of such deceptive or misleading conduct, what ES&S has described is simply competition, which is not grounds for a lawsuit.

For example, ES&S points to RBM's website, which describes the experience of several managers and executives of RBM, including their previous work for ES&S. Filing 137-6. But the website quite clearly states that these people were *formerly* ES&S employees, and nothing about the website implies any ongoing affiliation with ES&S.

ES&S next asserts that RBM is falsely claiming that the machines it supplies or repairs are certified by the Election Assistance Commission (EAC) or relevant state authority.[6] The only evidence that the Court can locate in the record of such a representation is RBM's website, which states that RBM offers "EAC Certified Voting Systems." Filing 137-6 at 1. The Court will assume, for the sake of argument, that RBM does make such representations on a wider basis—presumably, RBM would have a difficult time attracting and keeping customers if their maintenance caused voting machines to become decertified.

However, ES&S has presented no evidence that RBM's claims regarding certification are false or misleading, i.e., that RBM's maintenance causes voting systems to lose their certification, or that RBM is otherwise dealing in uncertified voting systems. ES&S points to the fact that RBM procures replacement parts for some machines by "cannibalizing" the parts from old ES&S machines that RBM purchases on the secondary market. *See* filing 139-2 at ¶¶ 4–7. But RBM has provided evidence that the parts it obtains in this manner are certified, are not modified, and that RBM has never received word from the EAC or any state or county government that taking a salvaged part from one certified system and replacing the same part in another certified system would have any effect on the latter system's certification. Filing 139-2 at ¶¶ 5–11.

ES&S next argues that RBM cannot claim that its technicians are qualified to maintain ES&S voting machines because they do not receive the

---

[6] ES&S has submitted a declaration from Steve Pearson, ES&S' vice president of certification, which explains the certification process. Voting machines must be certified at the federal level by the EAC. Filing 137-10 at ¶ 3–4. This involves a "rigorous review, analysis, and testing of a proposed voting system, including the hardware, software, and firmware, by an accredited voting system test lab." Filing 137-10 at ¶ 4. Once certified federally, a voting system must also be certified at the state level. Only "certified" components may be used in a voting system, and any changes to the hardware, software, or firmware are subject to prior approval. Filing 137-10 at ¶ 6.

ongoing training that ES&S' employees receive. That might show that ES&S' technicians are more qualified, but it hardly shows that RBM's technicians are unqualified. Relatedly, ES&S argues that RBM, by representing to consumers that it is qualified to work on ES&S voting machines, "implies a current connection, affiliation, or certification which RBM does not have." Filing 136 at 19. This argument is simply wrong—no such implied connection exists.

Finally, ES&S claims that RBM has been falsely claiming to be a "certified printer" for the DS200, one of ES&S' machines. In support, ES&S relies upon the declaration of Todd Urosevich, one of its regional sales managers. As part of his duties, Urosevich monitors the status of ES&S' customers' relationships with ES&S and its vendors. Filing 137-5 at ¶¶ 1–4. Urosevich avers that ES&S has "received reports that RBM has made statements that RBM is a certified DS200 printer." Filing 137-5 at ¶ 5. And, Urosevich explains, while ES&S does work with certain businesses as "partner printers," it does not have a certification program, and RBM has never been a partner printer. Filing 137-5 at ¶ 5.

Defendants object on hearsay grounds, and the Court finds the objection to be well-founded. Urosevich's declaration is based solely on unspecified "reports" from unidentified third parties. These reports are inadmissible hearsay. Fed. R. Evid. 801(c) & 802. ES&S has made no attempt to explain how it would offer this evidence in an admissible form. So, the Court will sustain RBM's objection and will disregard Urosevich's declaration. As such, ES&S has failed to present any evidence of deceptive or misleading conduct by defendants, and its final claim will be dismissed.

### F. Remaining Requests Under Rule 56(d).

In addition to the Rule 56(d) request discussed above, ES&S asserts that further discovery is necessary to show the following: "the precise origin of the M650 and its disposition, the origin of the firmware on the M650 and its disposition, the disposition of Hayek's tool kit and the firmware therein, [and] other ES&S-manufactured voting machines in RBM's possession that contain ES&S' confidential, proprietary, and trade secret information." Filing 137-1 at ¶20(f). The Court finds that ES&S has failed to show that it is entitled to further discovery of these matters under Rule 56(d).

No discovery is needed into the origin of the M650, as this was revealed in defendants' original motion for summary judgment. Defendants admitted that it came from Mahoning and that it was returned there following the Centre recount. *See* filing 113-2 at ¶¶ 37–43. ES&S might be entitled to further discovery regarding Hayek's toolkit, but the Court has already found

that this claim may proceed, and so ES&S does not require further discovery to withstand summary judgment.

ES&S is not entitled to further discovery into the origin of the firmware on the M650, because such discovery would not be material to any remaining claims for relief. As the Court has explained, the firmware was not copyrighted, nor was its use a misappropriation of trade secrets or conversion. ES&S does not claim that this information would bolster its claim for deceptive trade practices. And with respect to ES&S' claim for breach of contract, this information would not be material.

Similarly, ES&S is not entitled to its vague request for discovery regarding "other ES&S-manufactured voting machines in RBM's possession that contain ES&S' confidential, proprietary, and trade secret information." Filing 137-1 at ¶20(f). ES&S has failed to explain with particularity what evidence it would hope to uncover. And ES&S has not identified any way in which this discovery would support an actionable claim under any of its theories of recovery.

IV. CONCLUSION

After roughly 3 years, ES&S has yet to come forward with admissible evidence sufficient to create a genuine issue of material fact as to the majority of its claims. All of ES&S' claims against RBM will be dismissed. With two very limited exceptions, all of ES&S' claims against Hayek will also be dismissed. ES&S' claims against Hayek for conversion and for breach of contract, as to the toolkit that Hayek allegedly failed to return, may proceed. Accordingly,

IT IS ORDERED:

1.  Defendants' motion for summary judgment (filing 112) is granted in part and denied in part, as set forth above.

2.  ES&S' claims against defendant RBM are dismissed in their entirety.

3.  ES&S' claims against defendant Hayek are dismissed, with the exception of its claims for conversion and for breach of contract, as set forth above.

- 22 -

Dated this 4th day of February, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge